THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND SOJAK, Defendant-Appellant.

First District (5th Division)    No. 1—93—1871

Opinion filed June 2, 1995.—Rehearing denied July 12, 1995.

Barbara Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Timothy Felgenhauer, and Cathleen A. Dillon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE T. O'BRIEN delivered the opinion of the court:

Following a bench trial, the circuit court found defendant, Raymond Sojak, guilty but mentally ill of the October 10, 1990, murders of his wife and two children. Defendant received three concurrent terms of natural life in prison with no possibility of parole. He now argues that he received ineffective assistance of counsel and that he

proved his insanity by a preponderance of the evidence. We disagree and affirm.

## BACKGROUND

In the early morning hours of October 10, 1990, defendant took a crowbar and bludgeoned his wife and two children to death while they slept. Two notes, handwritten by defendant, were later found at the house. The shorter note read as follows:

"It is now 2 o'clock in the morning on Wed. I have just killed my wife & children. Why? I don't know. I was just thinking of killing myself which I should have done but that is too late ~~know~~ now. I never knew it was so hard to kill someone. I never knew it was so hard to kill someone. I thought that 1 or 2 blows from the iron would have done it. If I would have knew [sic] that it was this hard they would still be alive. I [sic] terribly sorry. I thought I would [letter stops]."

The second note stated the following:

"To whom it may concern

It is now 2 o'clock on Wed. morning and I have just kiled [sic] my wife & children. I would not have done it. I truly regret my actions and I ask God to give them peace in heaven because they had hell on earth with me. I truly tried to be a good father and husband and neighbor I never cheated on my wife in all our years of marriage even though I probably would have if I had a chance but ~~why~~ when they presented themselves I did not take the opportunity Why [sic] did I do it. I really don't know except that at the time I thought I could save them the pain & embarrassment of losing their house and father & husband as I hand [sic] every intention of killing myself by jumping on the El tracks for the insurance money so they ~~could~~ could have enough to stop the forelosure [sic] on the house. But when the news item got in the paper and it was spread around the neighborhood Pat said she could not live & face them people. I never knew it was so hard to kill someone. I thought 1 or 2 swings with the iron and it would have been over. God knows how sorry I really am. These seem like rambling and they probably are but it is hard to be collected when you are a murderer."

/s/ Ray Sojak [in the margin].

Later that morning, at 7:30 a.m., defendant telephoned the principal of the school attended by the two children. He informed her that the children would be absent due to illness. Defendant also left a telephone message with his supervisor at work, stating that his wife

had died and that he would explain the details later.[1] At 8 a.m., defendant received a phone call from Gail Beggs, a family friend. Beggs asked to speak to defendant's wife, Patricia. Defendant informed her that his wife could not come to the phone because she had laryngitis. When Beggs asked if one of the children could bring her some materials from Patricia on the way to school, defendant told her that the children would not be in school because they, too, were ill.

At 9 a.m., that same morning, defendant drove to a neighborhood gas station where he purchased two cans of gasoline. The gas station attendant noticed nothing unusual about defendant's conduct or appearance.

Approximately 15 minutes later, a teacher at the school across the street from defendant's house, Lydia Tabernacki, heard an explosion and saw smoke coming from the house. She ran across the street and saw defendant in the front room, moving his arms back and forth. Tabernacki called out to him that the house was on fire. He turned and ran toward the rear of the home.

Firefighters responding to the scene discovered the bodies of Patricia, Kimberly, and Thaddeus Sojak in their bedrooms. They also found defendant under a sleeping bag in the basement of the home. At the time, defendant was semi-conscious and told rescuers that he "was sorry" and to let him die. Defendant was taken to the hospital where doctors treated him for a self-inflicted stomach wound. Police arrested defendant later that day.

The ensuing investigation of the fire revealed that some accelerant had been poured on each of the beds on which the victims were discovered. No traces of accelerant were detected in the basement, although empty gas cans lay scattered where defendant was found. Police recovered the murder weapon, the crowbar, from the kitchen table. Although the crowbar appeared clean, forensic testing later revealed traces of human blood on it.

## I

Defendant claims that the failure of his court-appointed attorney to move for a discharge under the Speedy Trial Act (the Act) (725 ILCS 5/103—5 (West 1992)) constitutes ineffective assistance of counsel. The State responds that it brought defendant to trial within the time limits established by the Act; therefore, defendant's attorney did not provide ineffective representation.

Section 103—5(a) of the Act provides in pertinent part that

"[e]very person in custody in this State for an alleged offense

---

[1]On the previous day, defendant had falsely informed his supervisor that his wife was in the hospital with cardiac problems.

shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (725 ILCS 5/103—5(a) (West 1992).)

The 120-day period begins to run automatically when a defendant is taken into custody, and defendant need not make a demand for trial. (*People v. Garrett* (1990), 136 Ill. 2d 318, 324, 555 N.E.2d 353.) Our courts have construed the Act's provisions liberally and every case is to be decided on its own facts. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106, 440 N.E.2d 872.) To that end, each delay must be reviewed individually and attributed to the party which causes it. Any delay occasioned by the defendant will suspend for the time of the delay the period within which that defendant must be tried. (*People v. Smith* (1991), 207 Ill. App. 3d 1072, 566 N.E.2d 797.) Agreed continuances, made on the record, for example, constitute affirmative acts of delay attributable to a defendant and will suspend the speedy trial term. *People v. Turner* (1989), 128 Ill. 2d 540, 553, 539 N.E.2d 1196.

Defendant correctly notes that the State is accountable for the 49-day delay between his arrest and his arraignment. After the November 29, 1990, arraignment, the circuit court granted a number of agreed continuances which suspended the term. Defendant's argument, however, hinges on the attribution of two continuances after this period. The first occurred on September 29, 1992.

On that date, the parties appeared in court arguing over the turnover of defendant's medical records to an examining doctor. A dispute had arisen over certain medical reports, compiled by defendant's doctors, which the State's psychiatrists needed in order to complete their evaluation of defendant. In fact, the record contains two letters written to the trial judge by the head of the psychiatric facility selected by the State. Those letters indicate that defendant's examinations could not be completed because the doctors were "waiting to receive requested medical records from the Assistant Public Defender." At the hearing, the trial judge asked one of the State's doctors if, after an in-court tender of documents, he had what he needed to complete his evaluation. The doctor responded that he needed to read the documents. The matter was then continued to October 15, 1992.

■ Defendant insists that this continuance must be attributed to the State because the transcript does not indicate to which party the continuance was ultimately charged. He correctly notes that a delay will not be attributed to defendant on the basis of a silent record. (*People v. Turner*, 128 Ill. 2d at 553.) However, in this case, the record is not silent because the common law record "half sheet" indicates that the continuance was by agreement. In reviewing speedy trial

claims, this court is duty-bound to examine *both* the transcript of proceedings and the common law record so as to do complete justice to both the State and defendant. See *People v. Allen* (1971), 1 Ill. App. 3d 197, 199, 272 N.E.2d 296; *People v. Jenkins* (1968), 101 Ill. App. 2d 414, 418-19, 243 N.E.2d 259.

Defendant also points out that mere silence on the part of the defendant does not result in an agreement or waiver of the speedy trial right. (*People v. Reimolds,* 92 Ill. 2d at 106.) In *Reimolds,* the supreme court cited two cases in support of the above holding. In the first case, *People v. Cichanski* (1980), 81 Ill. App. 3d 619, 401 N.E.2d 1315, the circuit court set defendant's discovery and suppression motions for a hearing on December 8, 1978, and set the trial date for December 12. After denying defendant's motion to suppress on December 12, the court suggested a March 7, 1979, trial date. The record failed to disclose why the circuit court did not proceed with the trial as scheduled for December 12. The circuit court eventually discharged defendant due to the State's failure to try him within the time periods contained in the Act.

In upholding the circuit court's discharge of defendant, the appellate court noted that although it was "possible" that the State and defense counsel had agreed not to proceed with the trial at that time, "[t]he record *** is silent as to these matters and we may not so speculate." (*People v. Cichanski,* 81 Ill. App. 3d at 622.) The court held that because of the silent record, it could not fairly be said that defendant sought and contributed to delay by either an affirmative act or an express agreement. *People v. Cichanski,* 81 Ill. App. 3d at 622.

The same cannot be said in the present case because the record is not "silent." As previously noted, the half-sheet notation indicates that the parties agreed to the continuance. Further, the record reveals the reason for the discovery dispute—the examining doctor was awaiting records from defendant's attorney. Thus, the record affirmatively establishes that the defense contributed to the delay in obtaining these records, a delay which in turn necessitated the continuance now complained of here. In view of these facts, defendant indeed contributed to the delay.

The second case cited in *People v. Reimolds* does not compel a different result. In *People v. Burchfield* (1978), 62 Ill. App. 3d 754, 379 N.E.2d 375, defendant's counsel failed to object to the State's motion for a continuance. The appellate court, in finding that the Act had been violated, stated that a motion for delay by the State cannot be converted into a request for delay by the defendant merely because the defendant failed to object to the State's motion. (*People v. Burchfield,* 62 Ill. App. 3d at 756.) Here, however, the record does not

indicate that the State sought the September 29 continuance and that defense counsel simply stood mute. The record indicates that defendant agreed to it. That fact coupled with the delay regarding the medical records suggests a scenario substantially different from that in *People v. Burchfield*. Accordingly, we disagree with defendant's contention that the September 29 continuance should be chargeable to the State.

The second continuance challenged by defendant occurred in December after the State answered ready for trial. On December 9, the State filed a supplemental answer to discovery. Later that day, defense counsel came into court to speak to the trial judge about the newly filed discovery. The trial judge informed counsel that he would allow the defense a continuance in order to apprise itself of the new information. Counsel objected, arguing that the State should be charged with the delay. The trial judge told counsel that the matter would be taken up at the next court hearing which had been scheduled for December 11. On that date, defense counsel failed to appear because she was on trial in another unrelated case. The trial judge granted a continuance over the State's objection to January 27, 1993, on which date defendant's trial commenced.

Defendant now argues that the State's late filing of supplemental discovery constituted a ploy so as to defeat the statutory 120-day mandate. However, in *People v. Lendabarker* (1991), 215 Ill. App. 3d 540, 575 N.E.2d 568, the appellate court rejected a similar argument concerning the State's late discovery of a videotape. The defendant there was informed of the tape's existence 10 days before trial. The appellate court held that the circuit court correctly attributed the ensuing continuance to the defendant. (*People v. Lendabarker*, 215 Ill. App. 3d at 555.) In addition, we note defense counsel was not present for the December 11 hearing. A delay is properly charged to a defendant if his counsel was engaged elsewhere. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.) In view of the foregoing, defense counsel was not ineffective for failing to move for a discharge under the Act because the 120-day term was not violated.

## II

Defendant next asserts that he proved his insanity at the time of the offenses by a preponderance of the evidence.

Under section 6—2 of the Criminal Code of 1961, a person is not responsible for his conduct if "at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (720 ILCS 5/6—2(a) (West 1992).) A defendant bears the burden of proving insanity by a preponder-

ance of the evidence. (720 ILCS 5/6—2(e) (West 1992); *People v. Johnson* (1991), 146 Ill. 2d 109, 585 N.E.2d 78; *People v. Thurman* (1991), 223 Ill. App. 3d 196, 584 N.E.2d 1069.) The issue of a defendant's sanity is one of fact, and the trier of fact's determination on the matter will not be reversed unless it is contrary to the manifest weight of the evidence. *People v. Johnson*, 146 Ill. 2d at 128-29.

In arguing that the trial judge's determination is against the manifest weight of the evidence, defendant insists the State's witnesses in rebuttal were less credible than his own. To evaluate the merit of defendant's argument, a detailed review of the psychiatric evidence is necessary.

Dr. Paul K. Fauteck, a clinical psychologist, testified during defendant's case in chief. He examined defendant once in July 1992. He also reviewed the police reports from the case, in addition to defendant's handwritten notes and hospital records. Fauteck characterized defendant as a family man, who had undergone family therapy sessions the year before the killings. Defendant told Fauteck the purpose of the therapy was to help him deal with the financial problems the family was undergoing. Fauteck later admitted, however, that the sessions apparently had something to do with the behavioral problems of defendant's son. According to Fauteck, the handwriting in defendant's notes looks like that of a "seriously depressed person." In Fauteck's opinion, defendant suffered a "brief psychotic reaction around the time of the arrest incident." Defendant's references to suicide in his notes evinced the depth of his depression, although Fauteck found it insignificant that he never carried out his suicide plans.

Fauteck attributed defendant's psychotic reaction to the fact that on the day before the murders, a couple had come to the home in order to inspect it as a result of the house being foreclosed. Apparently, the home had been in defendant's wife's family for years and she was upset over the prospect of losing it. In Fauteck's opinion, the severe psychotic reaction had its onset within 36 hours prior to defendant's arrest. During this time, however, defendant could have functioned and appeared "normal." Fauteck characterized the reaction as a "mental disease." Defendant lacked the capacity to appreciate the criminality of his conduct and could not conform it to the requirements of the law.

Dr. Albert Stipes, a psychiatrist, also testified during defendant's case in chief. In Stipes' opinion, defendant was legally insane at the time of the offense. Stipes formed the opinion after interviewing defendant in July 1992 and after reviewing the various police and

hospital reports taken in the case. Stipes found defendant to suffer from major depression with "mood congruent psychotic features." The psychotic episode was brought on by the visit of a couple to the family's home as part of foreclosure proceedings. Stipes stated that defendant burned the home because he previously had told his wife no one else would have the home. Stipes believed defendant lacked the capacity to appreciate the criminality of his conduct and could not conform his conduct to the requirements of the law. Stipes also reviewed the letters written by defendant on the night of the murder and found them consistent with his diagnosis. He did not find it unusual that defendant stayed in the home with the bodies, stating the action was consistent with defendant's desire to commit suicide. Stipes could not identify when defendant's psychosis began or when it ended. Stipes stated that at the time defendant was at the gas station he was still under the psychosis, but he was able to conform his conduct to the law.

In rebuttal, the State called several lay witnesses who testified that defendant appeared sane to them in the weeks preceding and post-dating the murders. One family friend, Kathleen Mary Dutkiewicz, last saw defendant at approximately 5 p.m. on the day before the murders. Defendant looked "normal" and "sane."

Frederick Hartfield, another family friend, testified defendant worked for him delivering pizzas during the month preceding the offense. He never noticed anything unusual about defendant.

Dr. James Cavenaugh, a forensic psychiatrist, also testified for the State. Like the other experts, Cavenaugh interviewed defendant and reviewed all the pertinent reports. Cavenaugh described defendant as unemotional during the interviews. Although defendant evinced some signs of depression at the time of the commission of the crimes, Cavenaugh stated that in his opinion, defendant was able to appreciate the criminality of his behavior and was able to conform his conduct to the requirements of the law. Defendant displayed certain "schizoid" personality traits, but was not psychotic. His action of destroying his family suggested an impaired judgment and impulsiveness, rather than irrationality. Defendant told Cavenaugh that he knew hitting the victims with a crowbar would cause death or great injury and that he had written the letters two to three hours after the killings. Defendant denied acting as a result of an irresistible drive or impulse.

In surrebuttal, defendant presented the testimony of Dr. Lawrence Heinrich, a licensed clinical psychologist. After interviewing defendant and reviewing the reports in the case, Heinrich concluded defendant suffered an "acute psychotic break" at the time of the kill-

ings. The break resulted in deviant and bizarre thought processes. Defendant could not appreciate the criminality of his conduct nor could he conform that conduct to the requirements of the law. Heinrich could not state when the psychotic episode began or ended.

In making its determination on the issue of sanity, the trial judge was free to accept the opinion of one witness over another (*People v. Moore* (1986), 147 Ill. App. 3d 881, 498 N.E.2d 701) or accept part and reject part of each expert's testimony. (*People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434.) The relative weight to be given an expert witness' opinion is measured by the reasons given for the conclusion and the factual details supporting it. (*People v. Hoots* (1992), 228 Ill. App. 3d 42, 592 N.E.2d 483.) The trier of fact may even determine the issue of sanity solely on the basis of the opinion of lay witnesses if those opinions are based on the witnesses' personal observations of the defendant. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001.) Moreover, lay observations on defendant's sanity are particularly relevant if they are made shortly before or after the crime's occurrence. *People v. Williams* (1990), 201 Ill. App. 3d 207, 558 N.E.2d 1258.

Our review of the evidence reveals that all the psychiatric and psychological experts agreed on several things: that defendant was of average to above average intelligence and that he did not suffer from any organic brain disorder. All agreed he was not a schizophrenic. Not surprisingly, the experts disagreed on defendant's sanity at the time of the offense. Defendant's experts stated that the number of blows to the victims evinced the intensity of the psychotic reaction defendant had experienced. Cavenaugh disagreed, stating it was consistent with defendant's realization that it was difficult to kill a person. Cavenaugh viewed the fire as a means of covering up the killings because the victims' beds were set afire, whereas the defense experts saw it as a further sign of psychotic disorder.

Relying on *People v. Wilhoite* (1991), 228 Ill. App. 3d 12, 592 N.E.2d 48, defendant argues that Dr. Cavenaugh's opinion must be disregarded because it lacked proper foundation. In *Wilhoite*, this court agreed with defendant's assertion that she had proved her insanity at the time of the occurrence. In so doing, we disregarded the State's expert's opinion because doubts were raised about its validity. Specifically, the State's expert witness diagnosed defendant's condition as cannabis intoxication. However, the expert never asked defendant nor otherwise attempted to ascertain how much marijuana she had smoked on the night of the incident or at any other previous time. We noted that when an expert's opinion is without proper foundation, and particularly where the expert fails to take into

consideration an essential factor, that expert's opinion is of no weight and must be disregarded. (*People v. Wilhoite*, 228 Ill. App. 3d at 21.) We concluded that the amount of marijuana ingested prior to the crime in that case constituted an essential factor in the formation of the opinion regarding cannabis intoxication. Without such knowledge, no such diagnosis can be plausibly made.

■ We fail to see a similar lack of foundation in the present case. The State's expert, Dr. Cavenaugh, utilized the same factors in evaluating defendant's sanity as did the defense witnesses. All interviewed defendant. All reviewed the two notes written after the killings. All referred to defendant's hospitalization records and psychiatric examinations. All knew of defendant's prior involvement with family counseling. That the witnesses reached different medical conclusions based upon the same foundational evidence does not mean defendant sustained his burden of proof or that the State failed to carry its burden. Put another way, we cannot say that Dr. Cavenaugh's opinion regarding defendant's sanity raised serious doubts as to the validity of his conclusion and was entitled to little, if any, weight. The contradictory expert opinion presented the trial judge with a classic question of fact. No basis exists in the record to disturb the trial judge's determination.

Defendant's convictions are affirmed.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.