2021 IL App (2d) 170944
No. 2-17-0944
Opinion filed February 18, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12-CF-129 |
| MATTHEW WELLING | ) ) ) | Honorable Ronald M. Jacobson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hudson and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Matthew Welling, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and home invasion (*id.* § 12-11), following a jury trial. He was sentenced to 60 years for the murder and a consecutive term of 30 years for the home invasion. On direct review, we affirmed defendant's convictions and sentence. *People v. Welling*, 2016 IL App (2d) 140625-U. We rejected defendant's argument that the trial court erred by admitting evidence of defendant's aggressive behavior and threats towards third parties unrelated to the victims, Delmar and Betty Daniels. *Id.* ¶¶ 44-64. We also rejected defendant's argument that the evidence was insufficient to convict him of home invasion, because the State failed to prove the element of lack of authorization

to enter the victims' dwelling. *Id.* ¶¶ 66-72. We also held that defendant forfeited his claim of error in sentencing. *Id.* ¶ 81.

¶ 2 On August 9, 2017, defendant filed his *pro se* "Petition for Post-Conviction Relief." See 725 ILCS 5/122-1 *et seq.* (West 2016)). On November 6, 2017, the trial court summarily dismissed defendant's petition. Defendant timely appealed. For the following reasons, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4 The evidence presented at defendant's trial is discussed in detail in our order affirming defendant's convictions and sentence. *Id.* ¶¶ 4-32. However, we again must discuss the facts necessary to resolve this appeal.

¶ 5 On July 17, 2012, defendant was 32 years old. Prior to committing the home invasion and murder, defendant had been enrolled in a tech school, Westwood College in Chicago. Defendant had been kicked out of his uncle's home, due to arguments defendant had with his father. Defendant was staying with his friend, Jake Hvarre, in Amboy, where defendant used to live. Hvarre testified that defendant had been staying with him for about a week before defendant's arrest on July 19, 2012.

¶ 6 On the evening of July 17, 2012, after work, Hvarre and defendant went to the Last Alarm bar in Amboy, arriving at about 10:30 p.m. Hvarre left the bar before defendant and drove home. The next time Hvarre saw defendant was the next morning, sleeping on the couch.

¶ 7 After Hvarre left the bar, defendant continued to drink. The bartender testified that defendant drank a total of eleven Bud Lite drafts and four shots. Defendant was "polite throughout the night." While at the Last Alarm, defendant met James McCallister, James Prather, and Lindsey Glenn for the first time. McCallister lived at 116 South Davis in Amboy, which is less than 300

yards from the home of 79-year-old Delmar, the murder victim, and Betty, his wife. The homes are very similar in appearance.

¶ 8    While at the Last Alarm, McCallister bought defendant two shots. McCallister was celebrating his scheduled departure for the military in a few days. After the bar closed, the group decided to go to McCallister's house, which was about a two-minute drive away. McCallister rode with Glenn, who was highly intoxicated, but insisted on driving. Defendant rode with Prather. On the way to McCallister's, Prather and defendant stopped at a pavilion near the Amboy bars. There, defendant tried to pick a fight and was acting aggressively, so they left and headed to McCallister's house.

¶ 9    After arriving at McCallister's, Glenn began to vomit and passed out. Prather and McCallister put Glenn in the backseat of her car. They did not know her address, so they decided they would take her back to the bar, where she could sleep. Before they could leave, defendant got into the driver's seat of Glenn's car and attempted to leave with Glenn in the backseat. McCallister and Prather told defendant that he could not leave with Glenn. Defendant said that Glenn was "his girl" and "his responsibility." McCallister and Prather refused to allow defendant to leave with Glenn. Defendant stopped talking and just stared at the men, then walked away. Prather followed McCallister, who drove Glenn's car to the Last Alarm, where they parked Glenn's car. They rolled the windows down, locked the doors, and placed Glenn's cell phone and keys in the center console.

¶ 10    Prather and McCallister drove around looking for defendant, out of concern for Glenn's safety as well as their own. After arriving back at McCallister's, Prather and McCallister saw defendant in front of the house. As they exited the vehicle, defendant looked at them and said, "When you go home tonight and go to sleep[,] I am going to come back and kill you." McCallister told defendant to get off of his property or he would beat him up. McCallister characterized

defendant as severely intoxicated, belligerent, arrogant, and full of himself. The next day, McCallister found defendant's identification card and a pack of cigarettes across the street from his house.

¶ 11    On the evening of July 18, 2012, the Danielses' daughter, Lisa, went to their home to check on her parents because they had not answered the telephone. Lisa saw a bloody footprint on the front stoop and a bloody swipe mark on the screen door. Betty was on the floor next to her motorized scooter, which she needed due to suffering from multiple sclerosis. Delmar was lying on his back near the front door in a large pool of blood, obviously dead.

¶ 12    The closet door behind the front door of the Danielses' home had a hole in it, which appeared to be the result of the front doorknob striking the closet door. The police recovered a black T-shirt and a flip-flop on the floor. A pair of scissors and a bloody towel, along with a cord from a necklace, were near Delmar's shoulder. A small vial containing defendant's brother's ashes was recovered near the entryway. Delmar's handprint was recovered in the main entry. A broken glass vase, along with other items, was also recovered. There were bloody footprints made by a bare foot on the sidewalk in front of the Danielses' home.

¶ 13    DNA samples from the blood at the scene matched both Delmar and defendant. Latent and patent fingerprints and toeprints recovered from the Danielses' home were matched to defendant.

¶ 14    Delmar bled to death as a result of a number of sharp-force injuries. There were incised wounds made by something that tore open the flesh. The medical examiner opined that the broken glass vase had been stabbed into Delmar's face. He also suffered a fractured jaw and nose as well as fractured ribs on both sides of his body. Delmar had apparent defensive wounds on both hands.

¶ 15    At 3:50 a.m. on July 18, 2012, defendant texted a friend, Victoria Maloney, stating that "[he] f*** up." Maloney had known defendant since high school. Defendant had dated Maloney's

sister. After the text, Maloney and defendant talked on the phone. Defendant told her about seeing "somebody that was knocked out," about "running past the junior high school," and "waking up at Jake's." Defendant told Maloney that he "was in trouble" and was "going to prison." Maloney also recalled defendant saying that he was going to "turn himself in." He also told Maloney that he had blood all over his shirt and that he was running. Maloney asked defendant if the other person was young or old and defendant said, "[O]lder than him." Defendant told Maloney that he remembered being "alone at somebody's house." Maloney testified that defendant always carried his brother's ashes. In a letter Maloney wrote on defendant's behalf as mitigation evidence for his sentencing hearing, Maloney expressed regret for making the call to the police that led to defendant's arrest. She wrote that "[she] should've waited and gave him the chance to speak with his loved ones and turn himself in on his own before [she] put him in the hands of people who do not know [his] story."

¶ 16    Defendant was taken into custody on July 19, 2012, at Hvarre's house. Defendant had a large cut on his forehead and smaller cuts on his fingers, feet, and lower legs. Defendant had none of these injuries when he was last seen by McCallister and Prather.

¶ 17    Defendant gave a recorded interview to Detective David Glessner and Detective Shane Miller of the Lee County Sheriff's Department. Glessner told defendant that they knew what happened but that their job was to figure out why. Defendant repeatedly claimed that he did not remember what happened and that he "woke up Wednesday morning covered in blood, and [he] had] no idea why." He said that he could not remember anything after 12:34 a.m. and that he remembered that time because he looked at the clock in the Last Alarm and was "thinking [he] was gonna go home." Defendant said that he met some "younger guys" who bought him a shot. He also recalled that a girl was with them. Defendant said that he figured he got his "ass kicked"

at the bar. Defendant said that he drank "maybe" ten Bud Lite drafts, which was on "the high side" for him. He also drank one or two shots. Defendant said that, when he woke up, he pulled a "big piece" of glass out of his forehead. He said that he figured somebody hit him in the head with a bottle.

¶ 18 Detective Glessner explained to defendant that, sometimes after having a "blackout," things start to come back and you can piece things together like a puzzle. He told defendant, "[C]ertainly you've had a few memories of what happened after 12:34." Defendant told the detectives that, when Jake got the paper that morning and defendant read about the guy covered in blood, it "scared" him. He said, "I was gonna turn myself in, but I didn't know exactly how to."

¶ 19 Defendant recalled losing his flip-flops, his shirt, his necklace with the "little urn" containing his brother's ashes, and his "State ID." He said that he had all those items when he was at the Last Alarm.

¶ 20 Defendant said that he was trying to remember because "[he] want[ed] to know what happened [him]self." Defendant denied talking to anyone about what happened or what he thought happened. He denied texting or e-mailing any friends about what happened. Jake knew only that he was covered in blood. Defendant then said that he talked to his mother, who figured he got beat up in a bar fight. He said that he texted Maloney and that the only thing he told her was that he woke up covered in blood and did not know why. Defendant said that his mom, Maloney, and Jake just figured that he got his "ass whooped," because he pulled a piece of glass out of his forehead and little pieces out of his feet and hands. He threw the pieces of glass from his forehead outside somewhere.

¶ 21 Defendant again said that he was thinking about turning himself in and that, if he did so, "you guys could tell me what I did. I know I got a bad temper, I know it." He said that "just about

anything makes" him angry. Defendant said that he had been in fights in the past when he was 21 or 22. He said that he gets "mouthy" with people and is "always a smart ass."

¶ 22    Defendant asked the detectives to tell him what happened, but they refused because that would not help him. Defendant remembered "blood everywhere" and that he "ran" to "Jake's." He remembered that the room he was in was white. He denied seeing anyone and stated that he "just got up and ran."

¶ 23    Defendant denied being on any medication and denied using drugs recently. He had smoked "pot" a month earlier and used "coke" two or three months prior. Defendant said that he drinks "just once, twice a week." He said that he was going to school and was out of work. Jake was helping him out because his "crazy" father got him kicked out of his uncle's house over an argument.

¶ 24    Defendant was asked about what else he saw when he opened his eyes and saw blood. He said that he saw a "door in front of [him]" and that he "ran out." Asked about the article in the paper and whether he knew "these people," defendant said no and that he was not sure that he was there. However, he assumed that he was there, because he was "[at the sheriff's department] talking."

¶ 25    When asked if he had blackouts like this before, defendant said yes but "[t]hey're never bad though." By "bad," he meant that he "never woke up all tore up like this." Defendant said that he was in a "better than normal" mood at the Last Alarm that night. The pair of glasses he was wearing during the interview were not the ones he wore at the bar. That pair was "a little bent up," which was why he figured he "just got beat up." Defendant did not go looking for his ID or necklace because the "f*** paper scared the shit [out of] him." He also said that he didn't look because, if people saw him, they would think he got beat up.

¶ 26    Defendant was asked if he remembered beating a guy unconscious or if he ever told Jake, Vickie, or his mother that he beat a guy unconscious. He said, "No. But I said there was a guy unconscious." He said that all he remembered was that he "[s]aw the blood on the guy, and [that defendant] ran." Defendant continued, "That's it. That's all I got for you this time. I'm serious. I'm out, that's all I remember." Defendant was told that he was either slowly remembering more or being "more honest." He said that he was being more honest and trying because "[i]t's really hard to admit to shit like that. I'm sorry."

¶ 27    Defendant was asked what time he started "calling or texting people." He said, "[Y]ou guys got my phone" and that "[he] didn't delete nothing."

¶ 28    Defendant asked what happened to Jake, who had also been taken into custody. Detective Glessner said that Jake would be interviewed to see if defendant was telling the truth. Glessner told defendant that he did not believe defendant when defendant said that he did not remember and that Glessner thought that defendant was afraid to tell them. Defendant said that he was afraid to tell them what he already told them.

¶ 29    Defendant said that he wiped the blood off of the glasses that he wore that night so he could see. He soaked the shorts he had been wearing "just to try to get the blood out of [them]." He said that he thought he texted Vickie at 4 a.m. He admitted telling Vickie that he "f*** up." Glessner then said, "[I]f at 4:00am, you knew you 'f*** up,' then at 4:00am, you knew what happened." Defendant answered, "No. I didn't," At this point, defendant invoked his right to counsel. Prior to trial, the State agreed to defendant's motion to suppress everything after defendant said, "No. I didn't."

¶ 30    On July 20, 2012, defendant was found to be indigent and the public defender was appointed to represent him. Lee County Public Defender Robert Thompson represented defendant

throughout the underlying proceedings. Defense counsel filed several motions on defendant's behalf, including a motion for the appointment of an investigator to assist him in preparing a defense. Counsel also filed a motion for the appointment of a DNA expert. Both of these motions were granted due to defendant's indigency. The record shows that counsel explored plea negotiations and that the trial court admonished defendant pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012). The record also reflects that counsel did not request the appointment of a mental health expert to examine defendant. At trial, defendant relied on the defense of involuntary intoxication. 720 ILCS 5/6-3 (West 2012). During closing argument, counsel argued that the State's evidence was insufficient to prove knowledge or intent beyond a reasonable doubt. Counsel conceded that the evidence established that defendant was at the scene. Counsel argued, "However, you have no direct evidence of what exactly was the defendant's intent or what was on his mind." As to the threat defendant made outside McCallister's house, counsel argued that only McCallister heard it and that "Prather stated Mr. McCallister was under the influence of alcohol that night." Counsel argued that there was no evidence that defendant entered the Danielses' home without authority or that defendant knew that somebody was home.

¶ 31 Defendant's presentence investigation report reflects that defendant was in good physical health and had no current medical issues. He was not taking any prescribed medication. Further, "defendant denied any mental health problems and has not had any prior treatment or counseling services." Defendant mentioned that his father did have "some mental health problems" and that his "brother Will was diagnosed with schizophrenia about five years ago." Defendant reported a history of heavy drinking to the point of drinking "a 12 pack of beer or more daily." He said that he slowed down at age 23, drinking on Fridays and Saturdays to the point of intoxication. Defendant acknowledged blacking out and once being taken to the hospital by the police because

of his intoxication. Defendant was court ordered to undergo substance abuse treatment following his second DUI. (The "Clinical Discharge/Termination Summary," dated September 1, 2010, was attached to the presentence investigation report. The prognosis for defendant at the time of discharge was "poor," based on his belief that "his past and current use patterns of alcohol and marijuana are not affecting his life in a negative manner and his unwillingness to stop use and/or participate in treatment."

¶ 32    At defendant's sentencing hearing, defense counsel offered in mitigation six letters from defendant's family members and friends, attesting to defendant's good character. Defendant's stepfather stated that he "never has any issues" with defendant and that "we always got along fine." He noted that defendant "had enrolled in a tech school" and "was on the honor roll."

¶ 33    Defendant's mother said that defendant "hasn't had the easiest life growing up with a father that has mental disabilities his whole life." She stated that defendant "always helped friends whenever he could" and that "he doesn't have a violent past." She asked for "lenience in sentencing."

¶ 34    April Long wrote that she had known defendant for about 14 years. She described him as "kind and respectful." He was also "funny and always fun to be around" as well as "very easy going." Whenever she needed help, defendant was there for her.

¶ 35    Duke Jeres wrote that he had known defendant for about 12 years. He described defendant as "very protective and loyal" as well as "a good person."

¶ 36    Victoria Maloney described defendant as a "caretaker." When she was young, growing up in Amboy, defendant was there to keep her "in[ ]line." She described defendant as being there for her "at the drop of a dime." She said that the events that happened the night of the crimes "wasn't

normal for him." She said that defendant is a "good person involved in a bad situation with a lot of unknowns."

¶ 37    Jason Gascoigne described defendant as the "type of person that drops everything to help a friend." Gascoigne had known defendant since high school and was close to defendant's family as well. He said that everyone was confused about what happened.

¶ 38    Defense counsel argued that the crimes would never have occurred but for the abuse of alcohol and drugs, especially the "great quantity" consumed that night.

¶ 39    Defendant's *pro se* petition for postconviction relief made several claims. On appeal, defendant challenges only the trial court's dismissal of claim No. V, which reads:

> "Next, Petitioner argues trial counsel's failure to request a mental health expert to determine if the defendant had the necessary state of mind at the time of the crime to form the intent/knowledge needed for first degree murder violates defendant's rights under the sixth amendment of the United States Constitution and Article [I] section 8 of the Illinois Constitution. A mental health expert would have said [that] due to long term alcoholism and defendant being intoxicated at the time of the crime[,] the defendant could not form the necessary state of mind required to understand his actions at the time of the crime. The prosecution relied on defendant's intoxication to mistakenly go to the wrong house. Trial counsel should have investigated possible avenues of insanity due to intoxication. An expert in the effects of alcohol could have said that over time alcoholism alters the mind. Also that intoxication to the point of blacking out the defendant would not have known what he was doing nor have control over his actions."

¶ 40    In its written order dismissing defendant's petition, the trial court found that defendant's petition was not timely, that it lacked a supporting affidavit, that the claims were forfeited for not

being raised on direct appeal, and that the claims were frivolous and without merit. With respect to claim V, the trial court stated that the claim was "not supported by any evidence justifying the need for such evaluation and such is merely an unsupported conclusion." Defendant timely appealed.

¶ 41                                    II. ANALYSIS

¶ 42     On appeal, defendant argues that his petition stated the gist of a constitutional claim "where he alleged that counsel should have investigated whether he could raise an insanity defense due to the effects of his prolonged alcohol abuse." Defendant argues that his "assertion is supported by the record" and that defendant's "alcohol abuse was a key theme during trial." Defendant notes that "there is no record that a mental examination was ordered to determine if defendant had a mental disease or defect due to his alcohol and drug use." Defendant argues that trial (counsel should have seen the need for a mental health examination because "defendant stabbed the victim—a stranger—over 30 times with a shard of broken glass vase and reportedly said while stabbing and beating the man to death: '[C]an you hear it, can you hear it, Jesus is coming; can you feel it, Jesus is coming.' "[1] Defendant contends that, "without a psychiatric examination, it cannot be said whether or not an insanity defense could have been presented."

¶ 43     The State responds, arguing that defendant's petition "failed to allege pertinent facts" and that "defendant's argument has been forfeited and is unsupported by the record." The State concedes that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) does

_____

[1] Betty Daniels told police that she heard defendant utter these words while defendant was killing Delmar. Betty did not testify at trial.

not authorize a petition's summary dismissal based on untimeliness. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002).

¶ 44    We begin with the familiar principles that guide our analysis. The Act provides a three-stage procedural mechanism for a defendant to challenge his or her conviction or sentence for violations of federal or state constitutional rights. 725 ILCS 5/122-1 (West 2016); *People v. Knapp*, 2020 IL 124992, ¶ 43. At the first stage, within 90 days after the petition is filed and docketed, a circuit court shall dismiss a petition summarily if it determines that the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016); *People v. Allen*, 2015 IL 113135, ¶ 21.  A petition will be deemed frivolous or patently without merit when allegations in the petition, taken as true and liberally construed, have no basis either in law or in fact (*People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009)), *i.e.*, where the allegations rely on an indisputably meritless legal theory or a fanciful factual allegation (*Allen*, 2015 IL 113135, ¶ 25). "Meritless legal theories include ones completely contradicted by the record, while fanciful factual allegations may be fantastic or delusional." (Internal quotation marks omitted.) *Allen*, 2015 IL 113135, ¶ 25. "Section 122-2 of the Act requires that the petition must, among other things, 'clearly set forth the respects in which petitioner's constitutional rights were violated.' " *People v. Delton*, 227 Ill. 2d 247, 253 (2008) (quoting 725 ILCS 5/122-2 (West 2004)). The Act also requires that the petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016). The first stage of postconviction proceedings presents a " 'low threshold' requiring only a limited amount of detail in the petition." *People v. Jones*, 211 Ill. 2d 140, 144 (2004) (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). "However a 'limited about of detail' does not mean a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional depravation." *Delton*, 227

Ill. 2d at 254 (quoting *Gaultney*, 174 Ill. 2d at 418). "[F]ailure to either attach the necessary 'affidavits, records, or other evidence' or explain their absence is 'fatal' to a post-conviction petition [citation] and by itself justifies the petition's summary dismissal." (Internal quotation marks omitted.) *Id.* at 255 (quoting *People v. Collins*, 202 Ill. 2d 59, 66 (2002)). " 'At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is *arguable* that counsel's performance fell below an objective standard of reasonableness and (ii) it is *arguable* that the defendant was prejudiced.' " (Emphases in original.) *People v. Tate*, 2012 IL 112214, ¶ 19 (quoting *Hodges*, 234 Ill. 2d at 17). Defense counsel's duties include the duty to investigate any possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. "Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel." (Internal quotation marks omitted.) *Id.* We may affirm the trial court's order dismissing defendant's petition on any basis supported by the record. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010).

¶ 45     "The scope of the [postconviction] proceeding is limited to constitutional matters that have not been, nor could have been, previously adjudicated." *People v. Harris*, 224 Ill. 2d 115, 124 (2007); *People v. Youngblood*, 389 Ill. App. 3d 209, 214 (2009). Any "issues that could have been raised on direct appeal, but were not, are considered forfeited and, therefore, barred from consideration in a postconviction proceeding." *People v. Brown*, 2014 IL App (1st) 122549, ¶ 41 (citing *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010)). Postconviction claims that depend on matters outside the record may not be raised on direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. "[I]n Illinois, a defendant *must* generally raise a constitutional claim alleging ineffective assistance of counsel on direct review or risk forfeiting the claim." (Emphasis added.) *People v.*

*Veach*, 2017 IL 120649, ¶ 47. "It is not the function of collateral review to consider claims that could have been presented on direct review." *Id.* (citing *People v. Thomas*, 38 Ill. 2d 321, 323 (1967)). We review *de novo* a circuit court's dismissal of a postconviction petition. *Hodges*, 234 Ill. 2d at 9.

¶ 46    We first address the State's argument that defendant's claim of ineffective assistance of trial counsel is forfeited. In his opening brief, defendant argues that his "assertion" that counsel was ineffective "is supported by the record." Yet, in defendant's reply brief, he argues that, "based on the record available on direct appeal, trial counsel's decision not to pursue an insanity defense would have seemed to be a legitimate matter of trial strategy." Defendant notes the "strong presumption" that counsel's conduct fell within the wide range of reasonable professional assistance, citing *People v. Maya*, 2019 IL App (3d) 180275, ¶ 25. Defendant argues that he "challenges [the] presumption by alleging that counsel failed to investigate an insanity defense or have a mental health expert determine whether he could form the necessary state of mind to understand his actions at the time of the offense due to the effects of long-term alcoholism." Defendant argues further in his reply brief that his petition creates factual disputes as to whether counsel contacted a medical health expert, had defendant examined by an expert, or appropriately considered an insanity defense, which needs to be resolved at a third-stage hearing. Defendant's argument is completely refuted by the record. Defendant was represented by the public defender. He had no funds to retain an expert. The investigator and the DNA expert were paid by the county, on defendant's motion. It is clear from the record on direct review that counsel did not "request a mental health expert," which is the only fact defendant alleges in the claim at issue (claim V) in his petition. Whether the record on direct review is adequate to resolve a claim of ineffective assistance is determined on a "case-by-case basis." *Veach*, 2017 IL 120649, ¶ 48. "[T]he record in

this case was sufficient to resolve defendant's ineffective assistance of counsel claim on direct review." *Id.* ¶ 50. Therefore, we conclude that defendant's claim is forfeited for failure to raise it on direct review.

¶ 47    Forfeiture aside, we nevertheless conclude that defendant failed to state the gist of a claim that his trial counsel was ineffective for failing to request a mental health expert. Defendant "failed to plead facts that demonstrate that his attorney's actions fell below an objective standard of reasonableness when the attorney failed to investigate and present an insanity defense." *People v. Wilson*, 191 Ill. 2d 363, 372 (2000). Defendant does not allege that he suffered from a mental illness at the time of the crimes or that he ever asked counsel to request a mental health evaluation. In his brief, defendant cites *People v. Free*, 94 Ill. 2d 378 (1983), to support his argument that a mental health expert could have provided testimony that, at the time of the crimes, defendant suffered from a "fixed" or "settled" insanity due to long-term alcoholism. In *Free*, our supreme court held that "toxic psychosis induced by voluntary intoxication on drugs, alcohol, or both is not a 'mental disease or mental defect' which amounts to legal insanity under our statute." *Id.* at 406. "A voluntary intoxication or a voluntary drugged condition precludes the use of the insanity defense *unless* the mental disease or defect is traceable to the habitual or chronic use of drugs or alcohol [citation] and such use results in a 'settled' or 'fixed' permanent type of insanity. [Citations.]" *Id.* at 408. In other words, to be diagnosed as suffering from a "fixed" or "settled" insanity as a result of drug or alcohol abuse, a person must be "insane" when sober. There is no indication anywhere in this record that defendant ever exhibited symptoms of mental illness. He denied mental health problems and, according to friends and family members, he was a normal, functioning adult. There is no evidence in the record that defendant showed signs of mental illness proximate to the offenses before the ingestion of alcohol or after the effects of the alcohol wore

off. Like in *People v. Wilson*, "we do not believe that the sum of the evidence available to trial counsel would have placed a reasonable attorney on notice that an insanity defense was a possibility." *Wilson*, 191 Ill. 2d at 372. Under the facts available to counsel, an insanity defense was simply not viable.

¶ 48     All defendants are presumed sane. *People v. Hill*, 297 Ill. App. 3d 500, 517 (1998). Insanity is an affirmative defense. 720 ILCS 5/6-4 (West 2012). "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." *Id.* § 6-2(a). "When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to provide by clear and convincing evidence that the defendant is not guilty by reason of insanity." *Id.* § 6-2(e). Defendant's statement of facts omits critical, undisputed facts that contradict defendant's "claim."[2] Defendant texted and spoke to Maloney within hours of the break-in and murder at the Danielses' home, telling her that he had "f*** up" and was "going to prison." Given this evidence, it is not arguable that trial counsel was ineffective for failing to request the appointment of a mental health expert to examine defendant, as, regardless of the effects, alcohol and/or drug did not deprive him of "substantial capacity to appreciate the criminality of his conduct." *Id.* § 6-2(a). It is abundantly clear from the evidence at trial that defendant knew that what he did was wrong. He ran from the scene after taking off his blood-soaked shirt. He threw away the piece of glass that

_____

[2] We caution appellate counsel to abide by Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018), which requires that the statement of facts "contain the facts necessary to an understanding of the case, *stated accurately and fairly* without argument or comment ***." (Emphasis added.)

was imbedded in his forehead. He got scared upon learning that there had been a home invasion and murder and that he might be responsible. He admitted lying to the police about the details he recalled and apologized for holding back. He did not go looking for the items he lost, because he was afraid. He soaked the shorts he wore the night of the murder to get the blood out. He admitted that on July 18, 2012, at about 4 a.m., he texted Maloney that he "f*** up."

¶ 49　　It is clear from the evidence that defendant did not suffer from a "fixed" or "settled" insanity. Even when voluntary intoxication "is so extreme as to make a person unconscious of what he is doing, or to create a temporary insanity," it does not provide a defense to criminal conduct. (Internal quotation marks omitted.) *Upstone v. People*, 109 Ill. 169, 178 (1883); *Free*, 94 Ill. 2d at 406 (finding that toxic psychosis induced by voluntary intoxication is not a "mental disease or mental defect"). Defendant's theory that a mental health expert could have opined that defendant suffered from a "settled" or "fixed" permanent type of insanity is completely contradicted by the record, authorizing the summary dismissal of his petition. See *Allen*, 2015 IL 113135, ¶ 25.

¶ 50　　　　　　　　　　　　　　III. CONCLUSION

¶ 51　　For all of the foregoing reasons, we affirm the trial court's order dismissing defendant's *pro se* postconviction petition.

¶ 52　　Affirmed.

**No. 2-17-0944**

| | |
|---|---|
| **Cite as:** | *People v. Welling*, 2021 IL App (2d) 170944 |
| **Decision Under Review:** | Appeal from the Circuit Court of Lee County, No. 12-CF-129; the Hon. Ronald M. Jacobson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Adam N. Weaver, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Charles A. Boonstra, State's Attorney, of Dixon (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |