2021 IL App (2d) 190315-U
No. 2-19-0315
Order filed August 17, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| CAROL TAYLOR, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-D-952 |
| | ) | |
| GARY TAYLOR, | ) | Honorable |
| | ) | Robert E. Douglas, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

¶ 1    *Held*:    The trial court's classification of husband's retirement accounts as marital property was not against the manifest weight of the evidence where husband's commingled nonmarital funds were transmuted to marital property.

¶ 2    Respondent, Gary Taylor, appeals the judgment of the circuit court of Du Page County, dissolving his marriage with petitioner, Carol Taylor. Specifically, Gary appeals the trial court's classification of certain retirement accounts as marital property. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4    On December 16, 2000, Gary and Carol Taylor were married. The parties produced no

children while married, although each party had children from previous marriages. During their marriage, Carol made "less than $600 [a] year" working for Ring, a company that made video doorbells, while Gary worked as an endodontist before he retired in 2010. Aside from her work for Ring, Carol primarily spent her time doing chores at home because the parties agreed that Carol need not otherwise work during the marriage. Gary also told Carol that he would handle the parties' finances during the marriage.

¶ 5    On May 5, 2017, Carol filed a petition for dissolution of marriage, and a trial was held over the course of several days between August and December 2018. One of the issues at trial was the classification of Gary's various retirement assets as being either marital or nonmarital. Those assets included a TIAA-CREF individual retirement account (TIAA IRA), a Federal Asset Management Account (FAM account), and an IRA at Old Second National Bank (Old Second IRA). Both parties retained experts who testified about the marital or nonmarital nature of Gary's retirement accounts.

¶ 6                    A. Christiana Zouzias's Testimony

¶ 7    Christiana Zouzias testified that Carol had retained her "to analyze the earnings, balances, [and] activity in [Gary's] retirement accounts to understand the financials of [the parties], specifically the retirement accounts." In addition to testifying, Zouzias also prepared a report detailing her financial analysis. In her report, Zouzias sought to "determine what the beginning balances [of the accounts] were as of the date of marriage," the accounts' current totals, "as well as earnings, transfers[,] *** deposits[,] and distributions during the marriage."

¶ 8    Zouzias identified four retirement assets that Gary had as of the date of the parties' marriage: an Allmerica Financial Life Annuity IRA (Allmerica IRA), a profit-sharing account from his dental practice (PSP), the TIAA IRA, and a Fifth Third Bank IRA (FTB IRA). She also

discussed the various accounts that he opened during the parties' marriage. Zouzias's findings regarding some of the pertinent accounts—as supplemented by her report—follow below.

¶ 9                                      1. The Allmerica IRA

¶ 10    Zouzias first discussed Gary's Allmerica IRA, agreeing that there were previously "questions" as to whether the account was "[Gary's] prior to marriage." However, Zouzias eventually received statements showing that "as of 1997, three years prior to the marriage," Gary placed $200,000 from other existing accounts into the Allmerica IRA. Zouzias also received documents showing "significant increases and decreases in [the Allmerica IRA] between 1997 and 1998," and a statement that confirmed that the account held $276,069.14 as of December 31, 1998. However, Zouzias never received a statement showing the Allmerica IRA's balance "as of 2000." For this reason and because the account showed "so much volatility," Zouzias was never able to find the balance of the account as of the parties' marriage.

¶ 11    Relying on a tax document from 2005, Zouzias's report originally listed the Allmerica's account marital contributions as totaling $321,802. However, as of the date of her testimony, Zouzias did not know how accurate that figure was because, again, she did not "know what the balance [of the account] was as of the marriage date." Prior to receiving the 2005 tax document, she had only received statements from the account leading up to December 1998, which, again, indicated the value of the account as $276,069.14 at that time. Zouzias agreed that she was unsure whether the Allmerica IRA entirely consisted of premarital funds, because she "[did not] know what happened between 1998 and 2005 [with the account]." In compiling her report, she was never given any evidence "to show any contribution to the Allmerica IRA between the time period of 1997 and 2006" to know whether the account retained its nonmarital status.

¶ 12                                      2. The PSP

¶ 13    Zouzias testified that Gary's PSP was a type of retirement plan that shared the profits from Gary's dental practice. Zouzias was able to "identify and track the monies that [Gary] deposited into [the] account during the marriage," before it was closed. At the time of the parties' marriage, Gary had deposited approximately $319,581 into the account. Between 2001 and 2003, while the parties were still married, Gary deposited $80,500 of marital funds into the PSP in three separate increments. Zouzias was able "to track the earnings on that account based on statements and some estimates," finding that by the time the PSP closed, the $80,500 in marital monies that was deposited into the account grew to approximately *** [$]96,000." Aside from the deposits mentioned above, Zouzias believed that no direct contributions were made to the PSP between 2000 and 2008.

¶ 14    In 2008, the PSP was essentially "terminated," and Gary transferred $423,109 from the PSP into the TIAA IRA and "an additional [$]50,000 went into his [FAM account]." After these transfers were completed, "[a] minor amount of $670" was left in the [PSP], "which was [eventually] moved [to the TIAA IRA] in 2009." Zouzias was unable to determine what happened to the $96,000 after Gary closed the PSP because, after the "[PSP] was combined with the [TIAA IRA]," "some money went into [the FAM account,]" but Zouzias was unable to conclude "which money that was." On cross-examination, Zouzias disagreed that, even if all the PSP's marital contributions "went into the [TIAA IRA]" and not the FAM account, [then] she would be able to "calculate the percentage of what was [marital] monies versus [premarital] monies."

¶ 15                                 3. The TIAA IRA

¶ 16    Since approximately 1977, Gary maintained the TIAA IRA. As of the date of the parties' marriage, Gary had deposited approximately $317,000 of nonmarital monies into the TIAA IRA. In 2002, Gary transferred $255,402 from his existing, premarital FTB IRA into a Nationwide IRA,

which was opened that year. In 2005, Gary transferred $325,023 from the Allmerica IRA into a new, second Fifth Third IRA that was opened that year. In 2007, Gary transferred $343,738 from that second Fifth Third IRA and $325,747 from his Nationwide IRA into a Bank of Downers Grove IRA (Downers Grove IRA), which was opened that year. Zouzias agreed that both the Nationwide IRA and Downers Grove IRA funds could not be traced back to Gary's nonmarital funds, because she could not verify whether the Allmerica IRA—which contained funds that eventually rolled over into Gary's second Fifth Third IRA—contained marital funds.

¶ 17    In 2008, Gary pulled $473,109 from his PSP and placed $423,109 of that money in the TIAA IRA. Zouzias testified that "it would be a guess" whether this money included any of the $96,000 of marital money previously contained in the PSP. In 2009, $721,402 was transferred from Gary's first Downers Grove IRA into two new Downers Grove IRA's, the Old Second IRA, and a State Bank of Countryside IRA (Countryside IRA), all of which were opened that year. That same year, $49,330 was moved from the TIAA IRA to the FAM account. Zouzias was unable to determine whether this transfer included any marital contributions. In 2010, the money from the two newer Downers Grove IRAs and $111,382 of the Countryside IRA were all moved to the TIAA IRA.

¶ 18    When asked whether the transfers of the Downers Grove IRA funds and the Countryside IRA funds deposited into the TIAA IRA "diluted any portion of the [marital] monies that were placed into the [TIAA IRA] through the [2008] transfer from the [PSP] into the [TIAA IRA]," Zouzias responded, "I don't agree with that." According to Zouzias, such a conclusion was impossible to reach where the premarital and marital monies have "been combined and blended." Zouzias further explained that the nonmarital and marital assets in Gary's TIAA IRA were blended twice, once in the PSP, and again when the PSP was combined with the TIAA IRA.

¶ 19    While Zouzias's report indicates that the balance of the TIAA IRA was $1,258,690, as of the date of her testimony, she testified that balance was now "slightly" higher.

¶ 20                                  4. The FAM Account

¶ 21    Zouzias explained that that the FAM account was "essentially a custodial account that holds underlying real estate assets. It's—the custodial account is the Federal Assets plan, and then *** underneath that is an IRA, and underneath that, the actual assets are real estate developments in which [Gary] has subscriptions and ownership interests." She agreed that Gary was able to specifically decide which of these subscriptions he would like to "participate in." She further agreed that when Gary "purchased as a subscription any of the assets" of his FAM plan, he received "monies outside of when [those] assets sell," in the form of a regular dividend—one that was either "quarterly, monthly, or annually." These dividends were deposited "into the cash balance within his IRA within [the FAM account], and then that cash [was] used to purchase additional assets, or it sits." For Gary, this money was "predominately" used to purchase "subsequent real estate assets."

¶ 22    Gary's PSP had earlier held a $50,000 "real estate asset" in a property entitled SC Egerkingen, but once the PSP was divested, that asset was deposited into the FAM account. This deposit represented the $50,000 divestment from the PSP into the FAM account that took place in 2008. According to Zouzias's report, in 2009, an additional $50,000 was placed in the FAM account, with $670 representing the last amounts of the PSP and the remaining $49,330 coming directly from the TIAA IRA. In 2010, another $50,000 from the TIAA IRA and $140,000 of Gary's Countryside IRA were both transferred to the FAM account. Again, the Countryside IRA was initially funded from Gary's second Downers Grove IRA, which in turn was funded by his Nationwide IRA and the second Fifth Third IRA. The second Fifth Third IRA contained funds

tracing back to Gary's Allmerica IRA. In 2012, another $50,000 was transferred to the FAM account from the TIAA IRA. As of the date Zouzias's report was compiled, she found that the balance of the FAM account was $501,685. At the time of Zouzias's testimony, she reported that the "cost basis value" of the FAM account was now closer to "550-ish-thousand."

¶ 23    Schedule III of Zouzias's report was entirely dedicated to the various transactions and investments made through Gary's FAM account. In explaining her rationale behind including this schedule, Zouzias explained some of the difficulties she had in tracing the FAM account's assets to any premarital assets:

> "I created this schedule because I was attempting to trace the current assets back to the originating assets pre-marriage, and I truly was not able to do that because the money moved multiple times between accounts, from one account to another.

> And what's not evident here, *** is that even within the line of [the FAM account], there are multiple *** transactions and multiple movements of that money, purchasing of assets, selling them, purchasing other assets, selling some in cash, some in other assets***.

> ***

> Then when I started digging into the [FAM account], I realized that there were multiple transactions.

> So[,] *** there were multiple purchases, multiple sales, and then other purchases that are still being held within [the FAM account].

> So[,] it's not nearly as simple as looking at one balance, one asset[,] and tracing that to the ending balance. It's just not possible."

When asked whether she was able to determine which FAM subscriptions "were purchased with money from another account compared to monies that were already in [the FAM account], Zouzias

answered, "It's impossible to determine that."

¶ 24    Zouzias was similarly unable to identify how much of the FAM account's subscriptions specifically "came from the initial $80,500 dollars of contribution to his [PSP] during the marriage[.]" Zouzias explained her difficulties in deducing as much:

> "I cannot know where—if that initial [$50,000] investment was [nonmarital] money or [marital] money. I simply cannot know that.
>
> ***
>
> And then in 2009, 2010, 2012, when additional monies went into [the FAM account], again, I don't know—I can't determine—it's not determinable which money went where."

Carol asked Zouzias whether anyone would be able to make such a determination. Zouzias responded, "You cannot." Zouzias explained:

> "Because the monies that were contributed post-marriage were not segregated, they were combined with [the PSP] and then combined again with [the TIAA IRA].
>
> Some monies went into [the FAM account], more monies came from the combined [TIAA IRA] into [the FAM account], so any attempt to identify specifically is a guess."

¶ 25                              5. The Old Second IRA

¶ 26    As described above, Zouzias was aware that the Allmerica IRA was later "moved to the [second] Fifth Third IRA account, which was then moved to [the Downers Grove IRA], then moved again, then moved again, and ultimately a portion of that ended up in Old Second National." Specifically, after the balance of the Allmerica IRA was rolled over to the second Fifth Third IRA, approximately $669,485 from that account and the money contained within the Nationwide IRA were all transferred to the Downers Grove IRA. In 2009, Gary moved $240,000 from the Downers

Grove IRA to open the Old Second IRA. On cross-examination, Zouzias agreed that "no additional contributions were made to the [Old Second IRA] at anytime." The only additions to the account's balance came from "earnings within that IRA." Those distributions were never transferred into another retirement asset.

¶ 27                                6. Zouzias's Conclusions

¶ 28    Despite her tracking of Gary's accounts, Zouzias testified that she was not able to "trace the current assets back to the originating assets pre-marriage," because "the money moved multiple times between accounts, from one account to another."

¶ 29    Carol asked Zouzias, "Based on your investigation and analysis, what are the conclusions that you reached considering what you're asked to opine on?" Zouzias responded:

> "I was asked to quantify the ending balances of [the retirement accounts] *** as well as attempt to trace the pre-marriage monies to the existing assets.
>
> I tried and I found it impossible to trace from that $80,000[1] that was initially invested and determine which asset is being held as a result of that $80,000.
>
> The monies were combined multiple times in different plans, in different accounts. Those assets were sold within [the FAM account], reinvested, sold again[,] and are an existing asset.
>
> So[,] as I sit here today, I cannot tell you that I can trace the combined post-marriage contributions from those to existing balances. So[,] I cannot decipher, cannot trace those assets."

---

[1] Zouzias seems to be referring to $80,500 of marital monies deposited into the PSP in between 2001 and 2003.

¶ 30                                    B. Lee Gould's Testimony

¶ 31    Lee Gould testified that Gary hired him "to be his expert in this case," and that he "was asked to review, analyze, and make a determination as to the funding sources of certain retirement assets held in his name." As part of these duties, Gould also prepared a report outlining his findings.

¶ 32    Gould described his methodology for "forensic accounting and tracing," testifying that he first sought to "[understand] the nature of the accounts—account or accounts that [he was] trying to *** trace." He explained that he would talk to litigants, financial advisors, or whoever had "the most knowledge about the activity against which [he performs his] procedures," "request documents," and "draw some analyses or some preliminary opinions" before "drawing a conclusion ultimately." In analyzing Gary's retirement accounts, Gould mainly worked with Gary's accountant, Jeffrey Krol, and obtained "canceled checks, account analyses, notes, account statements, quarterly account statements, [and] some IRS documentation showing withdrawals from one retirement asset into a deposit into another."

¶ 33    Many of Gould's findings mirrored those of Zouzias. For instance, like Zouzias, Gould found that Gary held four different retirement assets as of the date of the parties' marriage: the PSP, the TIAA IRA, the Allmerica IRA, and the FTB IRA. Both experts also agreed that in between 2001 and 2003, Gary deposited a total of $80,500 into his PSP[2], but that by 2008, the majority of the PSP was "transferred out" to the TIAA IRA and FAM account. Both experts also testified that the $80,500 eventually appreciated to approximately $96,000. The experts typically

---

[2] While Gould explicitly acknowledged these marital contributions, he later agreed with Gary that he found "no new money *** was placed in any of [Gary's] accounts other than a rollover during the course of the marriage."

agreed as to the amounts and dates of the various transfers and deposits between Gary's retirement accounts.

¶ 34    However, the experts' conclusions as to the possible existence of any marital monies within Gary's Old Second IRA, the FAM account, and the TIAA IRA differed significantly.

¶ 35                              1. The Old Second IRA

¶ 36    Zouzias and Gould were both able to trace the inception of the Old Second IRA back to funds originally held within the Allmerica IRA, but the experts disagreed as to whether the Allmerica IRA itself contained marital funds. Again, Zouzias testified that $321,802 was held in the Allmerica account as of 2005, but that she was not provided with any documents necessary to determine the balance of the account as of the date of the parties' marriage. On the other hand, Gould's report specified that $321,802 existed in the account as of the parties' marriage in December 2000, suggesting that the entirety of these funds were nonmarital. While testifying, he acknowledged that, based upon a statement giving the account's balance of $276,069.14 as of December 31, 1998, "[he] now know[s] that the balance at or around the date of marriage was slightly less than [$321,802]." Gould only attached a few documents specifically regarding the Allmerica account's balance to his report. One, the 2005 tax document that Zouzias had mentioned, listed the value of that account as $321,802. The other document was contained in a supplement to his report, which indicated that as of December 31, 2000, the Allmerica IRA contained $200,000—a figure that was "based on the copies of the cancelled rollover checks dated April 4, 1997 from Batavia Savings Bank and April 5, 1997 from Pinnacle Bank."[3] Gould suggested that

---

[3] Furthermore, a second document attached to the supplement technically gave an account balance of the Allmerica IRA as being $321,802 as of the date of the parties' marriage. However,

this $200,000 was used to initially fund the Allmerica IRA.

¶ 37    According to Gould, Gary's Exhibit 33 "provide[d] *** [him with] information in regards to the history of [Gary's] [Allmerica IRA]." Exhibit 33 consisted of the rolled over checks that Gould had previously described, various applications dated from 1997, beneficiary forms, correspondence, transfer forms, and other miscellaneous items. No account statements were included in Exhibit 33, and none of the documents provided a balance for the Allmerica IRA as of December 2000. After reviewing these documents, Gould "found no such indications" that any contributions were made to the Allmerica IRA during the parties' marriage.

¶ 38    Because Gould therefore found the Allmerica IRA to be devoid of marital money, he agreed with Gary that "the moneys that were in the [Downers Grove IRA] *** were from pre-marriage moneys," leading him to opine that "100 percent" of the Old Second IRA was "pre-marriage moneys." Gould opined that Zouzias erroneously concluded that the composition of the Allmerica IRA was unclear, testifying that "Ms. Zouzias also in her report claims that the [Allmerica] account because there was no documentation there for it, it has to be deemed after the date of marriage. We now have that information, so that aspect of her report would be in error."

¶ 39                                    2. The FAM Account

¶ 40    While Zouzias was unable to identify how much of the FAM account's subscriptions "came from the initial $80,500 dollars of contribution to his [PSP] during the marriage," Gould concluded that $50,000 of these marital contributions were used to purchase the SC Egerkingen asset, while the remaining $35,500 appreciated to $46,000:

    "[B]ased on the dollars in after the date of marriage, which was $80,500, my report

---

this document was intended to explain the reasoning behind Gould's first estimate.

assumes that $50,000 went into the Egerkingen[,] which would have left $30,500 if I'm doing my math correctly, which grew from 2001, 2002, and 2003 to approximately 45-- $46,000."

Based on this assumption, Gould agreed that his "position [was] that [the FAM account] was started with marital moneys." Gould testified that "based on [these] calculations [he] performed and the assumptions [he] utilized, 77 percent [of the FAM account] *** [was] contributed post the date of marriage."

¶ 41    On cross-examination, Gould was asked about the $50,000 transfer that was deposited into the FAM account from Gary's TIAA IRA in 2009. Specifically, Carol asked, "Could that $50,000 be comprised of $46,000 that came from his [PSP] and gone into the [FAM account]?" Gould responded, "I don't know the answer to that because when you take funds and deposit [them] into an account of other funds, cash is fungible, I can't tell you which dollar bills got moved over. I don't know how to answer it any better than that." Gould provided the same answer when asked about the other $50,000 transfer between the TIAA IRA and FAM account that took place in 2012. He went on to explain that "when you take dollars and deposit, dollars in 2001, 2002[,] and 2003 with a substantial sum of dollars that were there prior to that date, I can't tell you which dollars were exactly transferred."

¶ 42                                3. The TIAA IRA

¶ 43    Gould disputed Zouzias's conclusions regarding the classification of the TIAA IRA. While Zouzias found that it was impossible to proportion the nonmarital and marital funds contained within the TIAA IRA because the monies had "been combined and blended" at least twice, Gould disagreed with her assessment "that the mere transfer of funds from the [PSP] into the [TIAA IRA] changed the identity of that account." When asked whether Zouzias's conclusions would

essentially "amount to the $80,500 of new money that was contributed during the marriage changing the entirety of the $1.9 million into what would be deemed after marital funds," Gould responded, "That's the conclusion that she would [ask] to be drawn based on my interpretation of her report that the entirety of the retirement—all of the retirement accounts that exist today should be considered, in her words, [marital] contributions."

¶ 44    Gould agreed with Gary that after the SC Egerkingen asset was assumably purchased with $50,000 of the $96,000 of marital assets in the PSP, the remaining $46,000 "went into the [TIAA IRA]." He consequently found that that "96 percent of the funds in [the TIAA IRA] were attributed to contributions prior to the date of marriage, and 4 percent were attributable to funds contributed after the date of marriage." Gould testified that he used a "rate of return" analysis and "a tracing analysis that [Krol's] office had done" in reaching his various conclusions.

¶ 45    On cross-examination, Carol asked Gould why he made the assumptions regarding his described apportionment of the $96,000. Gould responded, "I made that assumption because *** the return on the [TIAA IRA] was at a much lower rate than they were in the [FAM account], so I was trying to allocate the dollars that were deposited into the [PSP] in a position or a light most favorable to [Carol]." When asked how Gould knew the entire $96,000 was not instead transferred into the TIAA IRA, Gould responded, "Specifically do I have the dollar bill that said it was transferred there? I do not. Because when the moneys were deposited into the [PSP] they all looked alike[,] including all the significant dollars that were there prior to."

¶ 46                    C. Jeffrey Krol's Testimony

¶ 47    Jeffrey Krol testified that he had known Gary since 1980, once he began preparing Gary's tax documents "for his corporate and individual affairs." Since then, Krol began consulting Gary in different areas, including "investment planning, retirement planning, insurance planning, [and]

estate planning."

¶ 48    On cross-examination, Krol testified about a purported summary of Gary's assets as of December 15, 2000. The document listed Gary's interest in the Allmerica IRA as totaling $321,801.68 as of that date. Kroll recognized that he obtained this figure from an attached "2005 tax form." Carol asked whether he had "any other information, other than [that] one tax statement to know how much was in [that] IRA as of [Gary's] date of marriage to Carol." Krol responded, "Not at the time we didn't." Krol acknowledged later having received additional documents from 1998 giving a different value for the Allmerica IRA. However, Krol agreed that he didn't "know how much was in the [Allmerica IRA] between 1998 and 2005" and that he wasn't aware of any "deposits or withdrawals made by [Gary] into that account—or out of that account" between those dates.

¶ 49                                        D. The Trial Court's Decision

¶ 50    On December 20, 2018, the court issued its written judgment for dissolution of marriage (Judgment). The court attached a written letter opinion to the Judgment, in which the court resolved the outstanding issues between the parties, including the classification of assets. The court found that the TIAA IRA, FAM Account, and Old Second IRA were all marital property:

"During the marriage, testimony reveals that Gary added an additional [$80,500] to the [PSP] at the time the [PSP] was terminated, both [p]arties agree that the $80,500 had grown to $96,000.00. The $80,500.00, which was marital, lost its identity and was transmuted into Gary's [nonmarital] estate upon its deposit and was a part of the [nonmarital] estate subject to being reimbursed to the marital estate pursuant to 750 ILCS [503(C)(2)]. *** During the marriage[,] Gary made transfers into [the TIAA IRA] from other of his assets. He argues that all of the monies deposited in that account were from traceable [nonmarital] sources

- 15 -

and therefore retained a [nonmarital] character. Gary transferred money into the [TIAA IRA] from the [PSP]. A portion of that transfer was some of the $96,000 that was marital funds. Gary's experts claim to be able to trace with specificity how much of the $96,000.00 was deposited in the [TIAA IRA]. In their opinion, it was $46,000.00. The Court does not agree that the marital portion of the funds deposited in the [TIAA IRA] was clearly traceable. *** Gary's own expert, [Gould], testified that cash is fungible. There is no way to ascertain with certainty what part of the $96,000 went to the [TIAA IRA] and what went to the other accounts."

¶ 51    The court noted that it found Zouzias to be more credible than Gould and agreed with her opinion that "because of the multitude of transfers into and out of [the TIAA IRA,] it was impossible to tell where the marital $96,000 was." The court noted that Gary similarly failed to adequately trace any marital portions of the FAM account and the Old Second IRA. On January 18, 2019, Gary filed his motion to reconsider. On March 21, 2019, the court denied Gary's motion. Gary timely appealed.

¶ 52    We first addressed the parties' appeal in *In re Marriage of Taylor*, No. 2-19-0315 (2021) (unpublished summary order under Illinois Supreme Court Rule 23(c)) and dismissed the appeal for a lack of jurisdiction pursuant to *In re Marriage of Knoerr*, 377 Ill. App. 3d. 1042, 1049-50 (2007) (holding appellate court lacked jurisdiction where notice of appeal was filed while a petition for rule to show cause was pending in the trial court). The parties have since demonstrated the finality of the Judgment, and, accordingly, we turn to the merits of the appeal.

¶ 53                                  II. ANALYSIS

¶ 54    On appeal, Gary argues that the trial court improperly determined that the Old Second IRA, the FAM Account, and the TIAA IRA were marital in nature. Alternatively, if we find that

these retirement accounts were properly classified as part of the parties' marital estate, Gary argues that we should "enter an order awarding Gary's [nonmarital] estate reimbursement for the substantial contribution it made to said marital property." We address these arguments in turn.

¶ 55    "Before a court may distribute property upon the dissolution of a marriage, the court must first classify the property as either marital or nonmarital." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. The trial court's classification of property will not be disturbed upon appeal unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence where the "opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence." *Id.* Here, we find that the trial court's marital classifications of the Old Second IRA, the FAM account, and the TIAA IRA were not against the manifest weight of the evidence.

¶ 56                          A. The Old Second IRA

¶ 57    First, because Gary failed to prove by clear and convincing evidence that the Old Second IRA was acquired solely with premarital money, we find that the trial court properly characterized this account as being part of the parties' marital estate. Pursuant to the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/101 *et seq.* (West 2018)), property acquired after the parties' marriage but before the judgment of dissolution is generally presumed to be marital. 750 ILCS 5/503 (West 2018). The Act includes several exceptions to this general presumption, which must be proven by clear and convincing evidence. *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 63. One of these exceptions includes "property acquired in exchange for property acquired before the marriage." 750 ILCS 5/503(a)(2). "The party claiming that property is nonmarital has the burden of proof, and any doubts are resolved in favor of finding that the property is marital." *In re Marriage of Johns*, 311 Ill. App. 3d 699, 703 (2000).

¶ 58    Here, seemingly relying on section 503(a)(2), Gary argues that the Old Second IRA was nonmarital because it was funded entirely through other nonmarital retirement accounts that were opened prior to the parties' marriage and funded with nonmarital assets. However, he failed to show as much by clear and convincing evidence. The parties agree that the Old Second IRA was created after the parties' marriage. The parties also seemingly agree that the Old Second IRA was funded with $240,000 from Gary's Downers Grove IRA, which itself was funded through the Nationwide IRA and Gary's second Fifth Third IRA.[4] The second Fifth Third IRA received its initial funds from Gary's Allmerica IRA. Therefore, to show that the Old Second IRA came from purely nonmarital sources, Gary necessarily needed to prove that the Allmerica IRA did not contain marital money.

¶ 59    Gould testified that the Allmerica IRA contained no marital money. He initially found that the Allmerica IRA contained $321,802 as of the date of the parties' marriage, based on a 2005 tax form, giving the account's balance as of that year. The supplement to his report indicated that, as of December 31, 2000, the Allmerica IRA contained $200,000, a new figure that was now based on the 1997 checks from Batavia Savings Bank and Pinnacle Bank. Then, he eventually testified that as of the parties' marriage, the IRA contained "slightly less" than his initial $321,802 valuation, based on a 1998 statement giving the account balance as $276,069.14. After examining

---

[4] Gary's briefs seem to indicate that that he had only one Fifth Third Bank IRA, which was "liquidated" in 2002 before receiving funds from the Allmerica IRA in 2005. On the other hand, Carol suggests the 2005 transfer from the Allmerica IRA created a new, second Fifth Third Bank IRA. We adopt Carol's view, as it is supported by record. Nonetheless, the distinction is immaterial to our analysis.

all these documents, Gould "found no such indications" that any marital contributions were made to the account, which lead him to opine that "100 percent" of the Old Second IRA was "pre-marriage moneys."

¶ 60   Regardless, the trial court's decision to disregard Gould's testimony in favor of Zouzias's conflicting stance was not against the manifest weight of the evidence. "The trial court is free to accept one expert's testimony over another; experts' comparative credibilities and the weight to be accorded their respective testimony are matters for the trier of fact to determine." *People v. Hill*, 297 Ill. App. 3d 500, 517-18 (1998). Portions of Gould's findings were patently nonsensical. For instance, neither the 1997 checks, the 1998 statement, the 2005 tax document, nor any of the other Allmerica IRA documents in the record could have possibly provided Gould with the Allmerica IRA's December 2000 balance, especially given how volatile the account was. Regardless, Gould confidently provided three different figures for the account's balance as of the parties' marriage, and each figure was equally unsupported by the record.

¶ 61   Likewise, Gould's determination that the Allmerica IRA contained no marital money was also unsupported by any evidence contained within the record. Essentially, Gould determined that no marital contributions were made to the Allmerica IRA between the years 2000 and 2005, when the account's funds were rolled over into the second Fifth Third IRA. However, Gould only reviewed one document originating from this time period, the 2005 tax document. Unlike some of the 1998 account statements included in the record, the 2005 tax form did not contain any information regarding the account's activity or history. The 2005 statement was therefore wholly irrelevant in determining whether any contributions were made to the account after the parties' marriage, especially considering that it is impossible to compare the 2005 balance to the account's 2000 balance, which remains unknown.

¶ 62    On the other hand, Zouzias reasonably concluded that there was insufficient documentation to possibly conclude whether any marital contributions were made to the Allmerica IRA. While Gary repeatedly points out that no documentation proved otherwise, it was not Carol's burden to disprove the marital characterization of the account. Instead, Gary had the burden of showing by clear and convincing evidence that the account "was acquired in exchange for property acquired before the marriage." 750 ILCS 5/503(c)(1)(B); *Dann*, 2012 IL App (2d) at ¶ 63. Because Gary presented no evidence to establish that the Allmerica IRA was entirely nonmarital, the trial court correctly ascertained that the Old Second IRA, which came to include the Allmerica IRA's funds, was marital property.

¶ 63                               B. The FAM Account

¶ 64    Next, because Gary commingled marital and nonmarital monies within the PSP prior to acquiring the SC Egerkingen subscription and the FAM account, the trial court's classification of the FAM account as marital property was not against the manifest weight of the evidence. "If marital and [nonmarital] property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property." 750 ILCS 5/503(c)(1)(B) (West 2018).

¶ 65    For example, in *In re Marriage of Davis*, the respondent had a cash management account that had been created after the parties were married, in which he deposited inherited, nonmarital securities. 215 Ill. App. 3d 763, 767 (1991). Aside from the nonmarital securities that were used to open the account, the respondent subsequently deposited over $340,000 of marital funds into the account to earn higher interest "until he needed to withdraw those funds to pay expenses." *Id.* at 769. These deposits were not held in cash, but instead, were used to acquire other securities in a money market fund that was contained within the account. *Id*. These securities would then be

"sold to release funds to cover checks written against the account when the temporary cash holdings were insufficient." *Id.*

¶ 66    After the marriage was dissolved and the cash management account was classified as marital property, the respondent appealed. *Id.* at 768. Because the cash management account had originally been opened solely with inherited assets, the respondent argued that the trial court's determinations ran contrary to section 503(a)(1) of the Act, which specified that inherited assets are generally nonmarital. *Id.* While the respondent acknowledged marital contributions were made to the account in addition to these otherwise nonmarital assets, he argued that section 503(c)(1) of the Act specified that the marital contributions were transmuted into nonmarital assets. *Id.*

¶ 67    The trial court agreed that inherited assets—as well as acquisitions made solely with inherited assets—typically qualify as nonmarital property. *Id.* The court also agreed that if the inherited assets remained stagnant within the respondent's account and were separated from the parties' marital funds, the account would have maintained its nonmarital nature. *Id.* However, after examining "the structure and operation" of the cash management account, the court found that when the account's deposits were used to acquire the "other stock, bonds, or shares," "newly created assets came into being." *Id.* at 769. Finding that it was also impossible to distinguish which securities were specifically purchased from the marital contributions versus the inherited securities, the court went on to explain that under the Act, "[o]nce marital and nonmarital funds are commingled and lose their identity through acquisition of a newly created asset during the marriage, the asset is marital." *Id.* Since the newly acquired securities could not be differentiated from those purchased with nonmarital funds, the entire account containing all of the securities was deemed marital property. *See id.* at 770.

¶ 68    We find that *Davis* is analogous to the instant action. Just as the respondent in *Davis*

commingled marital and nonmarital funds in his cash management account, here, the record indicates that Gary commingled marital and nonmarital funds in his PSP. While the commingled monies in *Davis* were used to acquire new assets in the forms of "other stock, bonds, or shares," here, the PSP's commingled funds were used to acquire the SC Egerkingen subscription, the entire FAM account, and all of the FAM account's subsequent real estate investments. Therefore, while section 503(c)(1)(B) led the *Davis* court to find that the newly acquired securities were marital, here, the statute similarly leads us to conclude that the assets acquired from the PSP, namely, the SC Egerkingen subscription and the FAM account, were also marital.

¶ 69    Gary contends that the marital and nonmarital monies contained within the PSP never lost their identity, and thus, section 503(c)(1)(B) is inapplicable. His argument is unsupported by the record. Both parties agreed that the PSP's funds—which contained marital and nonmarital monies—were used to acquire the SC Egerkingen real estate asset. However, Gould went further, opining that this asset was acquired specifically from $50,000 of the $80,500 of marital contributions made to the PSP between 2001 and 2003, and not with any commingled funds. Based on this conclusion, Gould claimed that he was able to determine how the marital contributions to the PSP were used, suggesting that they remained segregated and never lost their identity.

¶ 70    However, his unsupported conclusion defies logic. Gould acknowledged that his proposed apportionment of the marital funds was an "assumption." He explained that he made this "assumption" because "the return on the [TIAA IRA] was at a much lower rate than *** in the [FAM account,]" leading him "to allocate the dollars that were deposited into the [PSP] in a position or a light most favorable to [Carol]." However, Gould's ideas of fairness and equity are irrelevant. Any conclusions based on his self-admitted assumption should be given no weight, as an expert's opinion "cannot be based on mere conjecture and guess." *Dyback v. Weber*, 114 Ill. 2d

232, 244 (1986).

¶ 71    Additionally, Gould contradicted his own assumptions by acknowledging that the marital funds deposited in the PSP were fungible. Specifically, he testified that "when you take funds and deposit [them] into an account of other funds, cash is fungible, I can't tell you which dollar bills got moved over. I don't know how to answer it any better than that." He went on to explain, "when you take dollars and deposit, dollars in 2001, 2002[,] and 2003 with a substantial sum of dollars that were [in the PSP] prior to that date, I can't tell you which dollars were exactly transferred." Therefore, Gould admitted that he was unable to trace the different funds that were deposited into the PSP. This admission supports the trial court's determination that the marital and nonmarital funds within the PSP lost their identity. No competent evidence in the record rebuts this conclusion.

¶ 72    Gary also argues that section 503(c)(1)(A) of the Act specifies that the $80,500 of marital contributions was transmuted to nonmarital property once it was deposited into the PSP, presumably before the contributions appreciated to $96,000. According to section 503(c)(1)(A), once marital and nonmarital property are "commingled by one estate being contributed into the other," "[i]f the contributed property loses its identity, the contributed property transmutes to the estate receiving the property." 750 ILCS 5/503(c)(1)(A) (West 2018). Relying on this language, Gary postulates that the $80,500 of marital money that was initially deposited into the PSP transmuted into Gary's nonmarital estate, because the PSP was created prior to the parties' marriage and was therefore nonmarital. Under this logic, Gary again argues that the FAM account, which was funded from the PSP, was acquired solely through nonmarital funds.

¶ 73    This argument is almost identical to the respondent's argument in *Davis*. However, like the respondent in *Davis*, Gary ignores the "the structure and operation" of his accounts. Specifically,

Gary disregards all the new assets that were acquired from the PSP's commingled funds, including the SC Egerkingen subscription, the FAM account, and its underlying real estate investments. Again, these newly acquired assets mandate the application of section 503(c)(1)(B), which in turn verifies the FAM account's marital classification.

¶ 74    Regardless of section 503(c)(1)(B), Gary's commingling of marital and nonmarital funds within the PSP and FAM account evince an intent to treat those accounts as part of the marital estate. *In re Marriage of Steel*, 2011 IL App (2d) 080974, ¶ 72. For all of these reasons, Gary was unable to show that the FAM account was acquired solely through nonmarital sources, and the trial court's conclusion regarding the marital nature of the FAM account was not against the manifest weight of the evidence.

¶ 75                           C. The TIAA IRA

¶ 76    Finally, the trial court's determination that the TIAA IRA was a part of the parties' marital estate was not against the manifest weight of the evidence. Similar to his arguments regarding the Old Second IRA and the FAM account, Gary repeatedly argues that the balance of the TIAA IRA could be traced exclusively to nonmarital funds obtained from other retirement accounts that were funded prior to the parties' marriage. Therefore, Gary implicitly suggests that the account was nonmarital property under section 503(a)(2). In support of this argument, Gary concedes that the PSP—which contained marital money—was ultimately deposited into the TIAA IRA. However, once again, he claims that under section 503(c)(1)(A), the $85,000 of marital contributions that was deposited in the PSP between 2001 and 2003 transmuted to nonmarital property. Therefore, Gary maintains that the account was derived exclusively from nonmarital sources. This argument is unavailing. As we have already noted, the Downers Grove IRA and Countryside IRA—both of which partially funded the TIAA IRA—could be traced back to money contained within the

Allmerica IRA. As we have found above, the Allmerica IRA was also marital in nature. Consequently, Gary is unable to show that the TIAA IRA contained solely premarital funds.

¶ 77    Furthermore, section 503(b)(2) of the Act reinforces our conclusion. Pursuant to that section of the Act:

"For purposes of distribution of property pursuant to this Section, all pension benefits (including pension benefits under the Illinois Pension Code, defined benefit plans, defined contribution plans and accounts, *individual retirement accounts*, and non-qualified plans) *acquired by or participated in by either spouse after the marriage* and before a judgment of dissolution of marriage or legal separation or declaration of invalidity of the marriage *are presumed to be marital property*. A spouse may overcome the presumption that these pension benefits are marital property by showing through clear and convincing evidence that the pension benefits were acquired by a method listed in subsection (a) of this Section" (Emphasis added.)

750 ILCS 5/503(b)(2) (West 2018).

In explaining what shall be "known as '[nonmarital] property,' " subsection (a) describes "property acquired before the marriage, *except as it relates to retirement plans that may have both marital and [nonmarital] characteristics*." (Emphasis added.) 750 ILCS 5/503(a)(6) (West 2018).

¶ 78    Here, given all of the transactions involving the TIAA IRA that were completed by Gary after the parties' marriage, Gary undoubtedly participated in the TIAA IRA after the parties became married. While Gary has argued that the TIAA IRA was devoid of marital funds, again, the account contained funds from the Allmerica IRA, which we've already found to be marital. Therefore, the TIAA IRA has marital and nonmarital characteristics, meaning that it does not qualify as nonmarital property under 503(a)(6). Again, Gary has also not shown that the exception

under 503(a)(2) applies either. He has not otherwise shown another exception under subsection (a) to rebut the presumption that the TIAA IRA was marital.

¶ 79    Gary has not argued that, by virtue of section 503(c)(1)(A), any PSP funds that were transferred to the previously nonmarital TIAA IRA transmuted to nonmarital property upon its deposit. Instead, he has only argued that the $80,500 of marital contributions were transmuted into marital property once they were deposited into the PSP. Therefore, the former contention is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct 1, 2020). However, even if the argument was not forfeited, 503(a)(6) casts doubt on section 503(c)(1)(A)'s applicability. Again, section 503(c)(1)(A) states that, once marital and nonmarital property are "commingled by one estate being contributed into the other," "[i]f the contributed property loses its identity, the contributed property transmutes *to the estate receiving the property.*" (Emphasis added.) 750 ILCS 5/503(c)(1)(A). Therefore, in order to show that any PSP funds transmuted to Gary's nonmarital estate upon transfer to the TIAA IRA, Gary would first need to confirm that the TIAA IRA was otherwise nonmarital. However, as we've found above, 503(a)(6) suggests that the account's premarital creation does not in and of itself conclusively establish that it was nonmarital property, because it had both marital and nonmarital characteristics. For these reasons, we find that the trial court's determination that the TIAA IRA was part of the parties' marital estate was not against the manifest weight of the evidence.

¶ 80                              D. Restitution

¶ 81    In the event that we affirm the trial court's allocations of the retirement accounts, Gary alternatively asks that we order his nonmarital estate to be reimbursed for the "substantial contribution" it made to the parties' marital estate. In support of his request, Gary cites 750 ILCS 5/503(c)(2) (West 2018), which reads, "When one estate of property makes a contribution to

another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. *No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift.* (Emphasis added.)

¶ 82    Here, Gary has failed to clearly or convincingly trace any of the nonmarital contributions purportedly made to the parties' marital estate. First, Gary has failed to provide any documentation or proof necessary to deduce the Allmerica IRA's marital and nonmarital composition. Because the Allmerica IRA's ambiguous funds eventually made their way to Gary's Old Second IRA and TIAA IRA, it is impossible to tell what amount of nonmarital funds—if any—were contained in those accounts. Indeed, Gary has not provided us with any proposed figures or calculations suggesting the amount of any nonmarital contributions made to either account. Instead, he devoted almost the entirety of his briefs arguing that these accounts were funded solely through premarital money. Because Gary has therefore failed to clearly trace and identify the contributions that may have been made to that account, he is not entitled to any restitution stemming from the Old Second IRA.

¶ 83    Similarly, Gary has failed to provide us with any clear or convincing accounting of any nonmarital contributions that were made to the FAM account. Again, all of the arguments that he dedicated to the FAM account claimed that the account was composed solely of nonmarital funds. Regardless, any attempt to calculate his entitled reimbursement would be in vain. As we have noted above, both experts were unable to convincingly theorize what happened to the $96,000 of appreciated marital contributions contained within the PSP. The PSP's commingled funds were subsequently used to acquire the SC Egerkingen subscription and to start the FAM account, which contained numerous other real estate subscriptions—each with differing rates of returns, as

acknowledged by both parties' experts. Other PSP money eventually made its way into Gary's TIAA IRA, which also provided a rate of return distinct from the other accounts receiving commingled funds. Because the portions of the nonmarital contributions making their way into these various assets therefore remains unknown, it is impossible to calculate what contributions, if any, that Gary is entitled to.

¶ 84                              III. CONCLUSION

¶ 85     For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 86     Affirmed.